UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No. 23-80149 |
| | ) | |
| Lee Hozey, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Judge Lynch |
| | ) | |

## MEMORANDUM OPINION

The United States Trustee moves to dismiss this case pursuant to 11 U.S.C. § 707(b)(3) on the ground that granting relief to the Debtor would constitute an abuse of chapter 7 of the Bankruptcy Code. (ECF No. 15.)  After trial, the Court finds in favor of the U.S. Trustee and will grant the motion.

## I.  PROCEDURAL HISTORY

Debtor, Lee Hozey, filed her chapter 7 petition for relief on February 9, 2023. She is not unfamiliar with the bankruptcy process, having brought two previous cases under chapter 7 in 2002 and 2011, each of which resulted in a discharge.[1]  This case has not gone as smoothly.  During his review at the outset of the bankruptcy the chapter 7 trustee noticed, among other things, a large discrepancy between the Debtor's reported income and the deposits shown on her bank statements, an unusual recurring tax credit, an adult daughter listed as a dependent with no explanation, a large number of discretionary purchases that did not appear to be consistent with her

---

[1] Case Nos. 11-34500 (discharge issued on November 21, 2011) and 02-43082 (discharge issued on November 4, 2002).  Ms. Hozey also filed two petitions for relief under chapter 13 in 2008.  Both of those cases were later dismissed.  Case Nos. 08-24506 (dismissed on October 30, 2009) and 08-10429 (dismissed on July 18, 2008).

schedules, and other inconsistencies and omissions in her bankruptcy filings. The case trustee referred the matter to the United States Trustee ("UST") for further consideration and the UST attended the meeting of creditors. Accompanied by her attorney, the Debtor testified at the creditors meeting on March 28, 2023 at which she was examined by the case trustee and the UST.

The UST timely filed this motion at the end of May 2023. Over the next several weeks, the Debtor voluntarily turned over additional information requested by the UST and the parties attempted to narrow the issues and explore a consensual resolution, but they could not reach an agreement. The UST conducted Rule 2004 examinations of the Debtor and two of her family members and the parties briefed the motion. The Debtor later filed her response brief along with amended statements of household income and estimated expenses, Schedules I and J. However, she did not file an Official Form 106 declaration to verify her amended schedules are true and correct. The parties also filed a number of stipulations, including stipulations as to the authenticity of each of their proposed trial exhibits. (Stipulation ¶¶ 1-27, ECF No. 34.)

At trial the UST called three witnesses – the Debtor, the chapter 7 trustee, and a bankruptcy auditor employed with the UST – and presented 21 exhibits which were received into evidence without objection. (Exs. 1-20, 22.) These included a recording of the meeting of creditors (Ex. 4) and transcript of the Debtor's Rule 2004 examination. (Ex. 19.) The parties also stipulated to the authenticity and admissibility of the transcript of the Rule 2004 examination of Amber Hozey (Ex. 20),

the Debtor's daughter, which was offered under Fed. R. Evid. 32 and received unopposed.[2] (Second Stipulation ¶¶ 3-5; ECF No. 36.)   The Court sustained the Debtor's objection to Exhibit 23, an analysis of the Debtor's bank statements generated by "Scanwriter," a commercially available analytic software package.   The Court also rejected the UST's offer of the exhibit under Fed. R. Evid. 1006 and ruled Exhibit 23 to be inadmissible.

The Debtor was questioned adversely at some length by the UST.   Her attorney followed, conducting a perfunctory redirect examination of his client.   In her case, the Debtor offered her only non-duplicative exhibit into evidence, Exhibit D, consisting of a copy of her Schedule F filed in August 2011 in case no. 11-34500, which listed creditors holding unsecured nonpriority claims. Once Exhibit D was received, Ms. Hozey's attorney rested without recalling his client.   The Court gave the Debtor the opportunity to reconsider by the end of that week whether to present additional evidence in support of her case, but she passed on that opportunity.   With the parties' agreement, the UST and the Debtor's attorney presented closing arguments in court several weeks later.

In his motion, the UST asks the Court to dismiss this chapter 7 case based on the totality of the circumstances. 11 U.S.C. § 707(b)(3)(B).   In particular, the UST argues that the Debtor understated her monthly income and failed to include average monthly contributions of at least $530 per month from her mother and $80 per month

---

[2] The parties did not introduce or stipulate to the admissibility of Exhibit 21 (for identification), the transcript of the 2004 examination of the Debtor's mother, Aminta Hozey, and that exhibit has not been considered by the Court in reaching its determination.

from her daughter.  Using the UST's calculation of the Debtor's net monthly income and making no changes to her scheduled expenses, the UST claims that the Debtor could pay 100% of her nonpriority, unsecured debts in a hypothetical chapter 13 plan. The UST then identifies other factors which he argues show that granting relief would be an abuse of chapter 7.  These include evidence that her employment is stable, her budget is unreasonable because she financially supports non-dependent adults at the expense of her unsecured creditors, her bank statements show excessive retail and restaurant purchases with no attempt to reduce discretionary spending, and that she failed to pay her creditors despite receiving additional income from a severance package with her former employer.

The Debtor denies that the totality of circumstances in her bankruptcy case constitutes abuse warranting the dismissal or conversion of this case.  She largely asserts a factual defense and offered both in her written response to the motion and her limited trial presentation explanations for the expenditures and actions identified by the UST.  For example, she argues that the UST's allegations of elevated discretionary spending and failure to reasonably reduce discretionary outlays were distorted and unduly selective.  The Debtor also challenges various assertions by the UST regarding her employment history and the adequacy of her disclosures about household income and expenses.  Her argument placed particular emphasis upon the "virtual absence of credit card debt" as well as alleging that her financial condition had been significantly impacted by substantial medical and "repossession debt."

The Court has closely examined the weight and sufficiency of the evidence presented at trial and has considered the stipulations of the parties and arguments of counsel. In addition, the Court takes judicial notice of the contents of the docket in this matter when appropriate. *See In re Miceli*, 587 B.R. 492, 495 (Bankr. N.D. Ill. 2018) (noting that the court can take judicial notice, when appropriate, of the docket of the case and the filings therein). For reasons the Court outlined on the record at the previous hearing on the motion and as set forth more fully herein, the Court finds that the UST has met its burden and demonstrated that dismissal of the Debtor's chapter 7 case is warranted and proper under 11 U.S.C. § 707(b)(3)(B).

## II. JURISDICTION

The district court has "original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). In accordance with 28 U.S.C. § 157(a), the district court has referred this and all other cases under title 11 to this Court. N.D. Ill. R. 40.3.1(a). As the motion seeks to dismiss the bankruptcy case, the issues presented here are central to the administration of the bankruptcy estate and, therefore, this is a core matter over which this Court has authority to enter final orders. 28 U.S.C. § 157(b)(2)(A), (O); *In re Smith*, No. 15 B 36486, 2016 WL 7441605, at *1 (Bankr. N.D. Ill. Dec. 27, 2016). Finally, the matter arises from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011). The parties also indicated their consent to the authority of this Court to enter final orders and judgments in this proceeding. (Stipulation ¶ 29.)

### III.  FINDINGS OF FACT[3]

The Court has considered the evidence and arguments presented by the parties at the trial and reaches this decision after careful consideration of the substance and credibility of the testimony and the exhibits admitted in evidence, and any reasonable inferences to be drawn therefrom, together with the stipulations of the parties.  From its review, this Court finds the salient facts to be as follows.

Lee Hozey, the Debtor, is a resident of McHenry County, Illinois.  For the past seven years she has resided in a rental property together with her grown children, Amber and Derrick, and her mother, Aminta Hozey.[4]  Amber, now in her late 20's, holds a graduate degree in "music business" from Northwestern, according to her mother.  Her trial testimony indicates that Amber was not regularly employed on the petition date, but now holds a full-time position as the music director at a high school in Racine, Wisconsin, where she has been working since August.  Son Derrick was attending high school on the petition date but had turned 18 and graduated by the time of trial.  As of then, he continued to live with the Debtor and the other adult

---

[3] The following findings, together with those set out in the "Discussion" below, set forth the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52(a) and Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[4] Their exact address was never established in these proceedings.  In her petition, the Debtor listed her address as 511 Northlake Road, McHenry, Illinois 60051.  She stated that her children and mother have lived with her at the Northlake Road location for the past seven years. (Ex. 19 at 17-18.)  Amber also testified at her 2004 examination that she lived with the Debtor at a single location for the past seven years, but she stated that the family lived in Lakemoor, Illinois. (Ex. 20 at 8.)  A number of other exhibits also placed the residence at the Northlake Road location in Lakemoor. (*See, e.g.*, Ex. 8 ("Recent Pay Advices"); Ex. 18 ("Dodge Journey Loan Statement"); Ex. 22 ("Chase Bank Account x1647 Statements").)  Certain tax returns filed by the Debtor, however, state her address to be 511 Northlake Road, McHenry, Illinois 60051, (Ex. 7 at 21 ("2022 Form IL-1040")), or indicate only that her residence is in "McHenry, Illinois" while redacting the street address, (Ex. 7 at 9 ("2022 U.S. Form 1040")).  The parties did not address this discrepancy at trial.

family members and was not employed or pursuing further education. Aminta Hozey, age 69, was no longer employed but was receiving Social Security benefits.

Represented by bankruptcy counsel, the Debtor filed her chapter 7 petition on February 9, 2023.[5] The Debtor does not contest that she signed the bankruptcy petition, schedules, statement of financial affairs and the Form 122A-1 filed in this case under penalty of perjury. (Stipulation ¶ 32.) She acknowledges that her obligations are primarily consumer debt in nature. (*Id.* ¶¶ 36, 38; Ex. 1, Question 16, Schedule E/F.) In her original schedules, the Debtor stated that she was employed as "Director of Sales Operations" since October 2023, but she did not identify her employer. She later explained at trial that her Schedule I listed her salary from "Ascension, at Brookdale Senior Living" where she had worked from October 2022 to mid-January 2023 as its Director of Sales Operations with an annual salary of $86,000. At some unspecified time, Ascension eliminated her position. According to the sworn account given at the meeting of creditors, while Ascension "did not want her in the building, . . . [she] was technically still employed and paid through mid-February." (Ex. 4.) Her severance agreement with Ascension recited that it would continue to pay her salary through February 15, 2023. (Ex. 14.) In addition, Ascension agreed, in pertinent part, to pay her "Severance Compensation" equal to twelve weeks of her base salary and described health insurance benefits.[6]

---

[5] The undated retainer agreement filed with her petition discloses that the Debtor paid $1,275 to her attorney, representing the entire amount of "Pre-Filing . . . & Post-Filing" legal fees and filing fees. (ECF No. 1 at 49.)

[6] The Debtor's banks statements for this period indicate that she in fact received the agreed upon payments. (Ex. 22.)

In the meantime, the Debtor was hired by Encore Wisconsin, LLC on January 27, 2023, as a full-time administrator for its Parkside Manor facility where she continues to be employed. Initially, Encore Wisconsin paid her a biweekly salary of $3,461 ($90,000 annually). She received a raise effective July 30, 2023, and now is paid an annual salary of $93,600. (*See* Ex. 8.) The Debtor also is eligible for bonuses. (*Id.*)

The Debtor's petition and schedules value her total assets at slightly more than $19,000. These consist primarily of a 2018 Dodge Journey and household goods and electronics. The Debtor rents her domicile, and she does not list any real property owned by her. Her schedules disclose total liabilities of $192,726.00, of which $177,554.00 is listed as unsecured nonpriority debt, including $6,821 which she characterizes as "medical debt" and $163,089.00 in student loans. The Debtor does not list any credit card debt. The UST's motion focuses particularly upon the following aspects of the Debtor's financial condition and activity, namely certain of the Debtor's property and assets, her wages and household income and her expenditures, and the Debtor's disclosures about them in her bankruptcy case.

**Property of the Debtor and the Bankruptcy Estate.** On the surface, the Debtor's petition and schedules are fairly straightforward. Her Schedule A/B lists less than $20,000 in property, the bulk of which is attributed to the 2018 Dodge valued at $11,590 and an estimated 2022 federal income tax refund of $5,500. The

Debtor scheduled only one secured claim related to the vehicle and $14,465 in nonpriority unsecured claims other than student loans.[7]

Like many things in this case, however, the Debtor's statements concerning her household's vehicles tend to be confusing, incomplete and contradictory. The only vehicle listed in Schedule A/B is the Dodge Journey, for which she routinely paid $429.98 per month to the lienholder before she commenced her chapter 7 case. (*See* Ex. 22 at 35, 40, 46, 50.) The Debtor's Statement of Intention indicates her desire to enter into a reaffirmation agreement and retain the Dodge. (Ex. 1 at 38.) However, Line 17a of the Debtor's original Schedule J ("Installment . . . Car payments for Vehicle") lists $0 instead of the actual amount of her monthly car loan installment expense. Instead, she indicates a "$430" expense item further down on Line 17c, describing the entry as "Anticipated Car Payment." (*Id.* at 29.) During her section 341 meeting held later that spring, the Debtor testified that she could not make the payments on the Dodge Journey, stating further that she intended to surrender the vehicle even though she wanted to keep it. (Ex. 4.) When asked if she had obtained a replacement vehicle yet, the Debtor replied: "nope, not yet." (*Id.*)

While it is possible the Debtor's intentions regarding the Dodge Journey changed between her petition date and the March 28 meeting of creditors, evidence presented at the trial paints a different picture. On January 16, 2023, a few weeks before the Debtor filed her chapter 7 petition, her mother bought a 2017 Nissan

---

[7] Shortly before the trial on the motion to dismiss, the Debtor commenced an adversary proceeding to determine that her sizeable student loan debt is not excepted from discharge under section 523(a)(8). Case number 23 AP 96016. On December 26, 2023, she voluntary withdrew her adversary complaint.

Rogue. (Ex. 17.) While this vehicle was purchased in Aminta's name and the Debtor did not co-sign the loan agreement, the Debtor paid the $500 deposit to secure that purchase. (Ex. 22 at 51.) When the $513.40 monthly loan payments for the Rogue came due beginning in March 2023, the payments were made from the Debtor's bank account. (*See, e.g.*, Ex. 17; Ex. 22 at 60, 64, 67.) The Debtor admitted at trial that she drives the Nissan Rogue, makes the car payments for that vehicle, and pays the premium to insure the car. (*See* Ex. 16.) The monthly car payment was first listed in the Debtor's amended Schedule J filed before trial. (Ex. 3 at 4.) Other than being purchased under Aminta's name, by all accounts and contrary to her testimony at the 341 meeting, it appears that the Debtor found a replacement for the Dodge Journey for her household, and she acquired that replacement vehicle before she commenced this case.[8]

The Debtor's Schedule A/B also discloses that she owned a single bank account at "Chase" which held a balance of only $25. This, too, is not accurate. The Court's own review of Exhibit 22 (which includes, among other things, the Debtor's bank statement for the period ending February 15, 2023) shows that the Debtor's Chase account actually held somewhere between $5,653.11 and $5,284.91 as of the petition

---

[8] At trial, the Debtor tried to explain that her mother purchased the Nissan Rogue for herself and intended to give her other vehicle, a 2012 Hyundai Elantra, to the Debtor's son. The Court does not find this testimony credible as it appears to be at odds with the Debtor's own trial testimony that Aminta barely drives and by the uncontroverted proof that the Debtor has made the payments on the vehicle, including the initial deposit and the subsequent loan payments. Although the Debtor testified that her mother paid one installment prior to when the Debtor started making payments in March 2023, the Court does not find this testimony to be credible either. The loan documents show the first payment was not due until March 2, 2023 (Ex. 17 at 9), and the Debtor's bank statements show she made a loan payment on or around March 8, 2023. (Ex. 22 at 60.) There was no evidence that Aminta made any payments directly to the lender for the Nissan Rogue.

date, the specific balance depending on when certain purchases from that date posted vis the filing of the chapter 7 petition. (Ex. 22 at 53-54.) Whatever the specific number, the Debtor's account balance was significantly higher than the $25 scheduled.

This discrepancy appears to be largely — although not entirely — related to a tax refund in the amount of $5,500.10 that was deposited into the Debtor's account one day earlier, on February 8, 2023. (Id. at 53.) Because the Debtor elsewhere had listed the anticipated tax refund as an asset, the Court ordinarily would not highlight this variance and just allow that the Debtor simply may have been unaware that the deposit had occurred. But here, the circumstances suggest the Debtor likely was aware of the deposit given her admitted level of spending on February 9, 2023, which included, among other listed debits, discretionary purchases that day at a pizzeria ($136.37) and shoe store ($173.03). Those purchases would have caused her account to be overdrawn if her tax refund had not already been deposited. Given these uncontroverted circumstances, the Court will conclude that the Debtor was or reasonably should have been aware that her account balance as of the petition date was significantly greater than the amount listed in her schedules.[9] Standing alone, this relatively minor error in the schedules might not warrant much discussion, but this proves to be yet another example of the errors and omissions riddling the disclosure of the Debtor's financial condition in her petition and schedules.

---

[9] Indeed, there was never a time in the weeks leading up to the petition date where the balance in her checking account fell below $150. (*See* Ex. 22 at 53-55.)

**Debtor's Income.** Debtor's scheduled information about her income also suffers from significant inaccuracies and omissions, which issues the Debtor did not begin to meaningfully address until well after the UST filed this motion. These issues begin with the Debtor's disclosures about her employment income. As indicated above, the Debtor's original Schedule I states she was employed as a "Director of Sales Operations" since "Oct 2023" (an obvious oversight since her petition was filed eight months earlier, in February 2023), but she fails to disclose the name or address of an employer. (Ex. 1 at 26.) Gross monthly wages were listed as $7,165.17. (*Id.*) The listed job title and level of income appear to coincide with the Debtor's employment with Ascension. (*See* Ex. 5.) But the Debtor admitted at both her 341 meeting and at trial that she began working for Encore Wisconsin on January 27, 2023. Her testimony disclosed that since then she has been employed as an administrator at Encore Wisconsin's Parkside Manor facility with a starting annual salary of $90,000 ($3,461 per biweekly pay period).[10] (Ex. 4.) Her own testimony demonstrates that at the time her petition was filed, the employment information listed on Schedule I was not correct,[11] understating her monthly gross income by more than $334.

---

[10] The Debtor also admitted this fact in her response to the UST's motion to dismiss. (ECF No. 23 ¶ 19.) As noted above, the Debtor's own pay records show she received a raise before trial and the Court finds that her current salary is $93,600. (*See* Ex. 8.)

[11] The Debtor explained at trial that she switched jobs on January 27, 2023, after her position with Ascension was eliminated, but that technically she was still employed by Ascension through mid-February. (*See also* Ex. 14 at 2 (severance agreement).) Schedule I expressly requires a debtor to disclose multiple employers, just the situation presented by the Encore / Ascension employment overlap. (*See* Ex. 1 at 26 ("If you have more than one job, attach a separate page with information about additional employers."). The Debtor nonetheless failed to do so.

It also appears that the Debtor's scheduled deduction of $1,318.94 for Tax, Medicare, and Social Security listed on Line 5a of her Schedule I was not correct, even when accounting for the fact it appears to use details from her job with Ascension. (Ex. 1 at 27.)  Based on her last Ascension pay advice, dated January 27, 2023, that figure should have been $1,257.43. (Ex. 5.)  This error in her original Schedule I caused her listed net monthly income to be incorrectly reduced by an additional $61.51.

On August 3, 2023, in conjunction with her response to the motion to dismiss, the Debtor filed unverified amended Schedules I and J. (Ex. 3.)  While this filing corrected some minor issues, such as properly identifying her employer, it also contains numerous inaccuracies.  For example, the Debtor now lists her gross monthly salary to be $7,500, which would have been consistent with her starting annual salary of $90,000 from Encore Wisconsin.  However, by the time her amended schedules were actually filed, the Debtor had already received a raise and her salary had increased to $93,600, as she acknowledged at trial, or $7,800 per month. (Ex. 8.)  This omission in the amended Schedule I improperly reduces her monthly net income by $300.  The Debtor's title and start date listed in the amended schedule also are inconsistent with her trial testimony.  Significantly, her amendments also failed to disclose bonus pay totaling $4,000 from Encore Wisconsin that she had received by then. (*Id.*)

Another inaccuracy is found in the Debtor's account of her payroll deductions for her new job.  While it is difficult to calculate precisely because the only pay advices

from Encore Wisconsin in the record are dated after the amended schedules were filed, the evidence indicates that the Debtor again overstated the amount of her tax deductions on Line 5a of her amended Schedule I. Specifically, the Debtor lists this amount as $1,510.17, (Ex. 3 at 2), but based on her pay advice dated September 1, 2023, (Ex. 8 at 1), which is the only pay advice received in evidence showing her regular work hours without any additional bonus pay, her tax deductions should have been listed as $1,273.20. This inflated deduction causes her monthly net income to be incorrectly reduced by at least $236.97, not an insignificant amount when considering the Debtor's ability to pay her creditors.

The Court finds based on the Debtor's own uncontroverted pay records and admissions that she would have more than $536 in additional monthly net income available from which she could pay creditors in a hypothetical chapter 13 plan if she had filed an accurate amended Schedule I. This result, of course, is before even considering the uncontroverted proof of household contributions discussed next.

**Contributions from Household Members.** First raised in its motion, the UST also questioned the Debtor's failure to disclose contributions the Debtor regularly received from adult members of her household. At trial the Debtor testified that she usually pays the household's expenses, including such items as the car insurance premium for her mother's car and Aminta's and Amber's cell phone plans, which are items that the Debtor listed as household expenses in her original and amended Schedule J. According to the Debtor, the adults in the household "pool" their funds together as needed to pay such expenses.

Page 14 of 30

These contributions are reflected throughout the Debtor's bank statements in the "Deposits and Additions" section as either "Zelle payments" (electronic transactions which are mostly from Aminta, but also occasionally from Amber) or as an "Online Transfer From Chk…8471" (which we now know are transfers from Amber's checking account). (*See* Ex. 22.)   In addition to questions about wages, property, business and interest income, retirement income and government benefits and support, to name a few categories, the Schedule I form requires a debtor to list "all other income regularly received . . . [including] 8c. Family support that you, . . . or a dependent regularly receive. . . . 8.h. Other monthly income. . . . [and] 11. . . . all other regular contributions to the expenses that you list in Schedule J."   Despite the fact there were approximately 50 such transfers into the Debtor's bank account during the 12 months preceding her bankruptcy petition, the Debtor did not disclose those transfers or any such contributions in her initial Schedule I.[12]

In its motion, the UST contends that "the Debtor received average monthly contributions of $530 per month from her mother and $80 per month from her daughter." (ECF No. 15 at 5.)   Although the motion does not identify specific bank

---

[12] The Court closely examined Exhibit 22, received into evidence without objection, which includes twelve bank statements for the Debtor's Chase account which pre-date the Debtor's petition beginning with the statement ending February 15, 2022. (*See* Ex. 22 at 1-52.)   The dates covered by these statements do not line up precisely with the February 9, 2023 petition date, but the difference is negligible for purposes of this analysis.   For example, by the Court's count, there are 51 contributions from Aminta and Amber reflected on the twelve monthly bank statements that pre-date her petition. If the Court were instead to look only at contributions dated within one year of the petition date, the count would change to 50 contributions (losing contributions of $50 from Aminta on January 20, 2022, $1,100 from Aminta on February 1, 2022, and $375 from Amber on February 1, 2022, but gaining contributions of $750 from Aminta on February 2, 2023, and $250 from Aminta also on February 2, 2023). (*See* Ex. 22 at 1, 53.)   Therefore, unless otherwise specified, when the Court indicates in this decision that a calculation is based on x-months before the petition date, or something to that effect, that refers to that number of monthly statements dated within that period.

statements, the motion's contention appears to be based on the Debtor's January and February 2023 account statements, which it specifically referenced, and likely the March 2023 statement as well. (Ex. 22.) Those three statements show four Zelle payments from Aminta ($500 on 12/28/22, $100 on 1/3/23, $750 on 2/2/23, and $250 on 2/2/23) for a total contribution of $1,600 (averaging $533.33 per month). They also reveal additional Zelle payments from Amber ($238 on 1/12/23, $2 on 1/12/23, and $20 on 3/8/23), for a total additional contribution in that form of $260 (averaging $86.67 per month).[13] (Ex. 22 at 49, 53, 57.) The motion suggests these are preliminary examples based on the limited information then available. The evidence presented at trial reveals that most of Amber's contributions came as direct transfers from the Chase account ending in 8471, the details of which had not been disclosed by the Debtor at the time the UST filed its motion.

On the same day she filed her response to the motion to dismiss, the Debtor also filed her unverified amended Schedules I and J and disclosed for the first time $530 attributed to "Mother's Social Security" and $80 from "Daughter's Contribution." (Ex. 3, line 8h.) Notwithstanding these additions to reported income, the amended Schedule J estimated the household's monthly net income to be less than the amount the Debtor originally scheduled with her petition, reducing that figure from $87.35 to $8.01. Among other changes, the amended schedules increased

---

[13] There is a slight discrepancy between the Court's calculations based on Ex. 22 and the average contribution amounts listed in the motion to dismiss. However, this difference is de minimis and readily explainable, especially since the figures found in the motion are only preliminary and based on the limited information then available.

payroll deductions for health insurance from $353.17 to $990.43, upped the Debtor's estimated monthly expenses for food and housekeeping supplies from $905 to $1,063.41, and increased miscellaneous household items (entertainment, clubs, recreation, newspapers, magazines, and books) from $0 to $100. Her amendments also reflect a change in car payments from her original $430 "anticipated" expense to the actual expense of $513.41 for the Nissan Rogue. The amended Schedule J also erroneously increased the figure shown for her renter's insurance monthly premium from $15 to $139.50 — the latter amount, the Debtor conceded at trial, reflected her annual premium and not her actual monthly expense. (*See* Ex. 15.) The Debtor's attorney relied on these changes listed in the unverified amended schedules to argue that his client could not fund a hypothetical chapter 13 plan even with the regular contributions from Aminta and Amber. (Response ¶ 36, ECF No. 23.)

The UST challenges the Debtor's revised figures. On the issue of contributions, the UST argues that, even after including the $610 monthly contributions revealed in the amended schedules, the Debtor still failed to "fully disclose" the monthly amount she regularly received. The UST points to the additional bank statements attached to the Debtor's response[14] as proof that during the 12 months before the petition date Aminta, Amber, and a source drawing on a checking account (later shown to belong to Amber) transferred a total of $13,114 to the Debtor.[15] The Debtor

---

[14] The Debtor attached to her response thirteen bank statements, for the periods ending February 2022 through April 2022 and June 2022 through March 2023 (the May 2022 statement is missing from the Debtor's attachments but is included in admitted UST Exhibit 22).

[15] The Court's calculation of the contributions for the 12 months prior to the petition show a total of $13,329 received from Aminta and Amber combined. This slight discrepancy is of no consequence and

does not dispute this and the Court finds based on the evidence presented that the Debtor received average monthly contributions of at least $1,092 during this 12-month period, only a portion of which was disclosed in her amended schedule.

In his closing argument, the Debtor's attorney urged the Court to consider instead a shorter period, an unspecified six-month snapshot, suggesting that would more "accurately" reflect the contributions received by the Debtor. It is not clear which six months counsel is referring to and he did not explain, let alone offer proof how such a timeframe would produce more representative or reliable information.[16] That being said, common sense dictates that the most complete set of data available from the evidence admitted should yield the most accurate measure. The entire 19-month period covered by Exhibit 22 reveals that a total of $20,399 was deposited into the Debtor's bank account from Aminta and Amber. This averages to $1,073.63 per month, an amount slightly less than the average calculated for the shorter 12-month prepetition timeframe.

The Court concludes that the 19-month average is the most reliable and accurate measure of the average monthly contributions the Debtor's household regularly receives from Aminta and Amber. Indeed, the Debtor's own testimony at

---

is likely the result of the UST using a different method to calculate the 12-month prepetition period. *See supra* note 12.

[16] If the court were to consider the six months prior to the petition, the calculation would actually work against the Debtor. During that period, the record reveals that Aminta contributed a total of $3,550 and Amber contributed a total of $4,926, which combined results in a net monthly contribution of $1,412.67. To the extent that counsel was trying to include in the average certain months where there were no additional contributions from Aminta and Amber, such as May 2022 through July 2022 or April 2023 through June 2023, the court rejects that argument. Those specific periods of time with no contributions correspond directly to, and immediately follow, the receipt of large deposits in the Debtor's account from either large tax refunds or severance pay which are not likely to occur again.

trial suggest that the $1,073.63 figure may be conservative, as she expects Amber's contributions to increase now that she is settled in at her teaching position.  Taking due account of this amount, the evidence shows the Debtor could afford to pay a substantial portion of her unsecured, nonpriority debts in a hypothetical chapter 13 plan without making any other changes to her monthly budget.

**Debtor's Expenses.**  The UST further argues that the Debtor's bank statements reveal her regular, unnecessary and costly spending on dining, entertainment and other items without meaningfully attempting to moderate her discretionary spending in line with her circumstances so as to be able to pay existing creditors.  Some nineteen bank statements were received in evidence on this point, all without objection. (Ex. 22.)  Covering seventeen full calendar months from February 2022 through June 2023,[17] the statements reveal a continuing pattern of superfluous spending at restaurants before and after the petition date, with monthly totals exceeding $1,000 per month except for April 2023 when the Debtor spent just under that ($957.43).[18]  In fact, in two of the months following her petition date, her discretionary spending at restaurants was significantly higher than average,

---

[17] The Court used calendar months here, rather than statement periods, to calculate the Debtor's spending.

[18] The Court did not admit the UST's Exhibit 23, which purports to summarize the Debtor's purchases by calendar month.  At trial, the UST called a bankruptcy auditor from its office to testify about the preparation of the exhibit and sought to have it received as a summary to prove the contents of voluminous records.  Fed. R. Evid. 1006.  The Court sustained the Debtor's objection.  The foundational testimony offered by the UST did not show exactly how his calculations used in the summary were made and what assumptions were used.  Moreover, the Court finds these calculations and the resulting summary were not shown to be reliable.  Indeed, at times they appear to be arbitrary.  Rather than rely on the UST's summary, the Court reaches its conclusions from the actual documents found in the unopposed Exhibit 22 and the testimony presented about them.

amounting to $2,638.96 in March 2023 and $2,415.80 in June 2023.  The Debtor's

own figures for his regular household expenses highlight the excessiveness of this

spending.  On average, the Debtor spent $1,554.62 per month at restaurants during

this period, an amount well in excess of the $905 total she listed under the category

"food and housekeeping supplies" in her original Schedule J or even the $1,063.41

given for that on her amended Schedule J.  If the Debtor had reduced her restaurant

outlays by a modest amount, even just to the amount she had scheduled for her total

food expenses, the evidence indicates she could have increased her available income

by an average of  approximately $500 per month.  But the evidence does not show the

Debtor making any appreciable adjustment to her spending, "belt-tightening" in her

words, during the weeks leading up to and following her bankruptcy.

Likewise, the Debtor's bank statements reveal significant spending on travel,

clothing and accessories, and even spa services, both pre- and post-petition.  During

the 19-month period covered by Exhibit 22, the Debtor spent at least $12,713.84, or

an average of $669.15 per month, on discretionary travel expenses not shown to be

related to the Debtor's employment.  While some of these expenses were incurred

before her bankruptcy, most occurred after the petition date.  These include a

$3,211.17 Expedia charge in March 2023 for a trip to Florida and another $523.45

StubHub purchase allegedly for tickets to a baseball tournament for her son.  The

Debtor does not dispute any of these purchases.  It is also uncontroverted that the

Debtor spent at least $2,340.43 to take the household on a trip to Las Vegas in May

– June 2023, for which her records include receipts for Expedia, Spirit Airlines,

United Airlines, the Stratosphere Hotel, and Uber charges.  Likewise, her records show the Debtor spent at least $3,752.23 on another trip to Florida later that June. All said, it is not disputed that the Debtor spent about $10,000 on three recreational trips with family members during the first four months after she commenced this chapter 7 case.

The Debtor's bank statements also reveal spending of at least $7,387.43 on clothing, shoes and accessories during this time — an average of $388.81 per month. This average also greatly exceeds, in this case by more than a factor of five, the $75 the Debtor herself indicated to be her regular budget for monthly "Clothing, laundry, and dry cleaning" expenditures in her original Schedule J (and nearly four times more than the increased figure later indicated in her amended Schedule J).  Here, too, the Court finds a pattern of unnecessary discretionary spending evidencing a persistent lack of self-regard for the Debtor's circumstances and her creditors.  For example, Exhibit 22 reveals 14 purchases at a clothing accessories store totaling $2,119.55, and another $589.22 spent on purchases at a sports apparel outlet.  When questioned about her monthly statements, the Debtor acknowledged purchases in excess of $2,169 at "spas" and like establishments, more than $800 of which taking place within a month of the petition date.  At trial, the Debtor attempted to relate some of these purchases to a "fall" at work, but her vague, self-serving narrative was not credible and was presented without any support to show that these purchases involved appropriate treatment for an actual medical condition.

### IV. DISCUSSION

#### A. Dismissal under Section 707(b).

Chapter 13 "enables an individual to" keep non-exempt property and "obtain a discharge of his debts if he pays his creditors a portion of his monthly income in accordance with a court-approved plan." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 64 (2011). Chapter 7, on the other hand, enables an individual debtor to obtain a discharge by giving up current non-exempt property but without devoting future income. 11 U.S.C. § 541(a)(6). Through several amendments to the Code, and in particular to section 707, Congress made it clear that it may be an "abuse" of chapter 7 for debtors with the ability to pay creditors to seek immediate liquidation and discharge. Under section 707(b), Congress authorized:

> After notice and a hearing, the court, on its own motion or on a motion by the United States trustee . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts . . . if it finds that the granting of relief would be an abuse of the provisions of this chapter.

11 U.S.C. § 707(b). The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 amended section 707(b) to replace the prior statutory presumption in favor of the debtor with a presumption of abuse if the debtor failed a mechanical "means test." *See, e.g.*, *In re Amaro*, 2020 Bankr. LEXIS 2751, at *17-18 (Bankr. N.D. Ill. Sept. 30, 2020). The means test, "the heart of BAPCPA's consumer bankruptcy reforms," was adopted "to help ensure that debtors who *can* pay creditors *do* pay them." *Ransom*, 562 U.S. at 64.

Dismissal under section 707(b) also is appropriate for a debtor who satisfies the means test "when the debtor is either 'dishonest' or 'non-needy.'" *In re*

*Stackhouse,* 582 B.R. 445, 450 (Bankr. S.D. Ohio 2018) (citing *Behlke v. Eisen, (In re*

*Behlke)*, 358 F. 3d 429, 434 (6th Cir. 2004).  Section 707(b)(3) provides that:

> In considering under paragraph (1) whether the granting of relief
> would be an abuse of the provisions of this chapter in a case in
> which the presumption in paragraph (2)(A)(i) does not arise or is
> rebutted, the court shall consider—
>
> (A) whether the debtor filed the petition in bad faith; or
>
> (B) the totality of the circumstances (including whether the debtor
> seeks to reject a personal services contract and the financial need
> for such rejection as sought by the debtor) of the debtor's financial
> situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

The Seventh Circuit described the main criteria under section 707(b) to be

"whether the debtors' income is high enough to enable them to repay a significant

amount of debt without sacrificing a reasonable standard of living." *In re Schwartz*,

799 F.3d 760, 763 (7th Cir. 2015).[19]  Largely for procedural reasons, *Schwartz*

involved the issue of "cause" to dismiss under section 707(a) rather than "bad faith"

or "totality of the circumstances" under section 707(b)(3).  The Court found that an

"unjustified refusal to pay one's debts" despite the ability to do so "without hardship"

constituted "cause" for dismissal under section 707(a). *Id.* at 763-64.  In doing so it

found that the debtors' expenditures "on inessential consumer goods and services,

including tickets to Disney World" as well as other "optional consumer expenditures"

including "private-school tuition for their children and a monthly payment of $850

---

[19] The other two criteria listed by the Seventh Circuit, "whether the debts are mainly consumer debts" and whether the debtor's "income is at least as high as the median family income in their region," are not disputed here. 799 F.3d at 762-63.

for a Range Rover" and on legal fees contesting creditor collection efforts rather than debt repayment was "optional rather than essential" consumption. *Id.* at 761-63.

Here, the UST seeks dismissal under section 707(b)(3), arguing that the totality of the circumstances of the Debtor's financial situation demonstrates abuse of chapter 7. The UST "bears the burden under section 707(b)(3) of demonstrating that the totality of the circumstances indicates abuse." *In re Smith*, 2016 WL 7441605, at \*4 (Bankr. N.D. Ill. Dec. 27, 2016) (citing *In re Johnson*, 503 B.R. 447, 451 (Bankr. N.D. Ind. 2013)). Unlike the presumption of abuse by application of the bright line "means test" to the debtor's disposable income on the petition date used under section 707(b)(2), section 707(b)(3) has no formulaic presumption of abuse. Rather, under this provision a court has discretion to consider the debtor's actual financial situation, "not limited to considering the debtor's financial situation only as it existed on the day the petition was filed." *In re Roppo*, 442 B.R. 888, 892 (Bankr. N.D. Ill. 2010) (citing *In re Pennington*, 348 B.R. 647, 651 (Bankr. D. Del. 2006)). The court, instead, "may, and indeed must, consider the debtor's financial situation at the time the motion to dismiss is heard." *Id.*

The Bankruptcy Code does not define "totality of the circumstances." Nor has the Seventh Circuit addressed the term for purposes of section 707(b)(3). *In re Bacardi*, 2010 Bankr. LEXIS 3, at \*7 (Bankr. N.D. Ill. Jan. 6, 2010). Courts have suggested that the test "requires a more subjective, holistic assessment of the debtor and his circumstances." *Id.*; *see also In re Watts*, 557 B.R. 640, 646 (Bankr. N.D. Ill. 2016); *In re Kruse*, 545 B.R. 581, 589 (Bankr. W.D. Wis. 2016). This "analysis is fact-

intensive and performed on a case-by-case basis." *In re Bacardi*, 2010 Bankr. LEXIS

3, at *10.

Under the totality of the circumstances test the "debtor's ability to pay" her

debts "may be the most relevant factor" in determining abuse of chapter 7. *In re

Deutscher*, 419 B.R. 42, 45 (Bankr. N.D. Ill. 2009) (citing *In re Cutler*, 2009 WL

2044378, at *3 (Bankr. S.D. Ind. July 9, 2009); *In re Green*, 934 F.2d 568, 572 (4th

Cir.1991)). But a court must also consider:

> (1) whether the bankruptcy petition was filed because of sudden illness,
> calamity, disability or unemployment; (2) whether the debtor incurred
> cash advances and made consumer purchases far in excess of his ability
> to pay; (3) whether the debtor's proposed family budget is excessive or
> unreasonable; and (4) whether the debtor's schedules and statement of
> current income and expenses reasonably and accurately reflect the true
> financial condition.

*Id.*

With regard to the first factor, the evidence demonstrates the Debtor's ability

to make substantial payments to her creditors. It is not disputed that the Debtor was

employed full time by Encore Wisconsin as an administrator while also on the payroll

of Ascension when she commenced this chapter 7 case. Within a few months, she had

received her agreed upon severance from Ascension and a $4,000 bonus payment from

her new employer, as well a 4% pay raise which boosted her gross annual salary to

$93,600. All the while, two adult family members living with her have regularly been

contributing substantial additional sums to the Debtor for household expenses. The

evidence shows, for example, from January 18, 2023 through August 15, 2023, the

Page 25 of 30

Debtor's bank account received on average more than $1,073 per month in contributions from Aminta and Amber.

This income, some of which was inaccurately disclosed or not disclosed at all by the Debtor in her schedules, enables her to pay creditors without hardship or even without significantly altering the budget she proposed for her household. Even accepting her revised budget estimates contained in the unverified amended Schedule J (adjusting only for her acknowledged renter's insurance premium overstatement), the weight of the evidence shows that the Debtor received or can reasonably be expected to receive more than $39,000 in disposable income—more than twice the total amount of her unsecured non-student loan debt she now seeks to discharge—over the first twelve months following the petition date. That amount, of course, includes the non-recurring severance pay from Ascension and salary "overlap" paid by Encore Wisconsin in 2023. Even without such "one-off" receipts, and assuming no further salary increases or bonus pay, it can reasonably be expected that the Debtor could continue to have significant disposable income of over $13,000 each subsequent year during a hypothetical chapter 13 plan even without considering the increased contributions the Debtor expected to receive from her working daughter.

The Court also finds that the Debtor's bankruptcy schedules and statements, particularly those disclosing her income, do not reasonably and accurately reflect her financial condition. The defects in her disclosures are significant and recurring. She does not dispute her schedules did not accurately disclose her employer or salary

when she filed her petition.  On August 3, 2023, only weeks before the trial on the motion to dismiss and well after the inaccuracies were first raised by the UST, the Debtor filed an amended Schedule I which identified her current employer and the increased deduction for her new medical insurance.  But as discussed above, this filing still failed to correctly list her salary income.  It did not reflect the 4% salary increase or the $4,000 bonus pay shown on her paystubs.  Nor does her amendment indicate that she also continued to be paid her salary by Ascension through February 15, 2023, and received severance pay representing an additional 12 weeks of salary after that.

Notably, the Debtor's amended Schedule J acknowledges for the first time that the Debtor regularly received contributions from her household members.  But her filing appears to merely restate the figures proposed by the UST  in its motion, sums which proved to be less than the typical amounts received from the adult household members.  The Debtor did not explain how she arrived at the figures she used and offered no proof to controvert the bank statements showing the actual amount of funds transferred from Aminta and Amber to the Debtor's account.  Indeed, during her examination by the UST she could not confirm whether she had read the amended Schedules I and J before they were filed by her attorney, recalling only discussing changes in the schedules during a telephone call with him.  The Debtor never verified these amended schedules.

As for the third factor, the Debtor's proposed regular family budget was not shown to be particularly excessive or unreasonable notwithstanding the

discrepancies revealed at trial.  To be sure, the Debtor herself admitted that some of her itemized budgeted expenses for telecommunication services were unnecessary or duplicative and included items (cellular lines, for e.g.) solely benefitting Aminta or Amber and that she simply miscalculated other amounts (the monthly renter's insurance premium).  And while the concern regarding the accuracy of what the Debtor disclosed about the car purchased shortly after the petition date is not misplaced, the Court does not find the issue to be one of budgeting per se.  While the Debtor claimed that the listed "Anticipated Car Payment" relates to a vehicle purchased in her mother's name, the record indicates that it is the Debtor, not Aminta (rare exceptions aside), who actually drives it.  The movant has not shown the Debtor's budgeted expenses to be so inaccurate or excessive to be abusive.

Abuse is evident, however, from the Debtor's pattern of excessive and unnecessary spending during the months leading up to and following the petition date as reflected on the bank statements.  The Debtor does not challenge the evidence of this spending and failed to credibly show its reasonableness, let alone necessity, and even admitted to "elevated spending" in January and February 2023.  While acknowledging these purchases were discretionary, she asserted that she had resolved to undertake "belt-tightening." (Response ¶ 43-45.)  The record reveals this argument to be as empty as it is misplaced.  Instead of examples of belt-tightening, the Court finds in the record receipts for recreational travel to Las Vegas and Florida, costly retail purchases and restaurant tabs, and other expensive, unnecessary discretionary spending.  That the Debtor's persistent superfluous spending has not

added to her indebtedness does not warrant disregard of the uncontroverted proof of her persistent spending her available income on extravagances rather than paying her creditors. *See Schwartz*, 799 F.3d at 763-64.[20]

Lastly, the Court finds this case was not filed due to "sudden illness, calamity, disability or unemployment." *Deutscher*, 419 B.R. at 45. While Debtor's brief and her attorney's argument reference medical bills listed in her 2011 bankruptcy, the Debtor has presented no evidence of any sudden illness or calamity prompting her to file this case. While her rather cryptic account of her job change occurring around the petition date leaves much detail unanswered, the record does not reveal a relevant period of unemployment and disruption of income. Rather, her own bank statements indicate that her former employer continued to pay her salary to mid-February 2023. In the meantime, the Debtor was hired by Encore Wisconsin. As noted above, her separation resulted in the Debtor receiving severance benefits (the compensation equal to twelve weeks of her Ascension salary) shortly after the petition date. Her new job pays her more. Not only was her initial base salary at Encore Wisconsin greater than her Ascension salary (albeit the latter comes with a more expensive healthcare benefit for which she began to pay a premium several months after her start date), but since then she has received a 4% raise.

Accordingly, this Court finds the totality of the circumstances weigh heavily in favor of dismissal. The Debtor has a meaningful ability to pay her creditors and is

---

[20] Affirming the bankruptcy court's dismissal of the chapter 7 case under § 707(a), Judge Posner pointedly remarked: "[w]hat the Schwartzes failed to do was to pay as much of their indebtedness as they could without hardship. Their action was deliberate and selfish, and provides good cause for denying the discharge." *Schwartz*, 799 F.3d at 763-64.

burdened by no sudden emergency or calamity. Though advised and represented by bankruptcy counsel, as she was in her four previous bankruptcy cases, the Debtor's statements and schedules present an unreasonably inaccurate account of her financial situation, notably by understating the Debtor's available income and the funds available for her creditors. Additionally, the record reveals persistent, unnecessary and excessive spending on travel, restaurants and retail purchases by Debtor. Upon its review of the evidence, this Court concludes that granting relief in this case would be an abuse of chapter 7.

## V. CONCLUSION

For the reasons stated above, the Court will grant the motion of the UST. Pursuant to 11 U.S.C. § 707(b)(3), the case must be dismissed or converted. At the conclusion of the hearing on the motion, the Debtor's attorney stated that his client is not interested in the conversion of her case to chapter 13. Nevertheless, the Court will allow the Debtor the opportunity to further consider her position in light of the determinations made by the Court. Accordingly, the Court will allow the Debtor to file a motion to convert this case to chapter 13 within 10 days from the entry of the Order accompanying this decision should she so elect. If no motion to convert is filed by then, this chapter 7 case will be dismissed without further notice or hearing.

DATE: April 30, 2024

ENTER:

Thomas M. Lynch
United States Bankruptcy Judge